## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                            No. CR 15-522 RB

JOSE EFRAIN CAVAZOS,

     Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING MOTION TO SUPPRESS

Defendant Jose Efrain Cavazos moves to suppress evidence that Border Patrol Agents obtained after arresting him.   (Doc. 51.)   The Court held an evidentiary hearing on May 26, 2015. Having reviewed the parties' submissions and arguments, the Court GRANTS Defendant's motion to suppress.

### FINDINGS OF FACT

1.     Around 12:30 a.m. on November 20, 2014, United States Border Patrol arrested Defendant Jose Efrain Cavazos for allegedly participating in a conspiracy to transport an illegal alien.   Border Patrol arrested Defendant at the Petro gas station off Interstate 10 outside of Deming, New Mexico.

2.     After arresting the Defendant, Border Patrol Agent Pedro Gutierrez took Defendant's phone and put it with a second phone—the so-called desert phone that the Agent had been using as part of an undercover rouse.   Agent Gutierrez put both cell phones in Defendant's car.

3.     Supervising Border Patrol Agent Raul Herrera, Jr. read Defendant his *Miranda*

rights in Spanish.   Defendant elected to make a statement after he was read his *Miranda* rights. He said that he was at the Petro gas station to pick up a friend of a friend whose car had broken down.

4.      While reading Defendant his rights, Agent Herrera could hear a cell phone ringing inside of Defendant's car.

5.      Agent Gutierrez appeared with Defendant's cell phone in hand and asked if he could check who called and look in Defendant's phone.

6.      Defendant responded, "Go ahead.   I have nothing to hide."

7.      In the Government's briefing, Supervising Agent Herrera stated that he heard Agent Gutierrez "ask Defendant for permission to see who was calling and look through the phone."   (Doc. 52 ¶ 12.)   In his testimony, Agent Herrera affirmed that Agent Gutierrez asked to look in Defendant's phone to see who was calling.   His testimony was equivocal about the exact words that Agent Gutierrez used.

8.      The ringing phone was not Defendant's phone, but the desert phone.   Border Patrol Agent Gutierrez confused the phones because he jumbled the two phones together.   His actions were improper, but he made the mistake in seeming good faith.

9.      Defendant did not know that there was a second cell phone placed in his car.   To compound his confusion, the desert phone had the same ring tone as Defendant's phone.   At the time, Defendant had no way of knowing that the ringing phone was not his phone.   Even Agent Herrera testified that he assumed that the ringing phone belonged to Defendant.   Like Defendant, Agent Herrera had no reason to believe otherwise.   Only Agent Gutierrez knew that two phones were inside of Defendant's car.

10.     Based on Defendant's statement, Agent Gutierrez searched Defendant's cell phone.

His search was thorough enough to discover a four-month old text message that said, "Ey dnde estas manda la direccion para ir x ti. Somos Los que lo van a llevar a tucson."  This roughly translates to "Hey where are you send the address to go to you.   We are the Ones that will take him to tucson."   Agent Gutierrez showed this text message to Agent Herrera.

11.    Agent Herrera then showed Defendant this text message.   After showing Defendant the text message, Defendant confessed that the "friend of a friend" story was untrue. He admitted that "Angelita" paid him $100 to pick up the man from the gas station.

12.    At the Deming Border Patrol station, Defendant declined to sign a consent form permitting agents to search his phone.

13.    This was not the Government's original explanation for how Border Patrol discovered the text message.   In fact, the Government presented at least four iterations of this story.

14.    First, the Government claimed that Border Patrol found the text message because La Chaparra, Defendant's alleged co-conspirator, sent it to Defendant shortly after Defendant's arrest.  (Doc. 33 at 5.)   After the Federal Public Defender's investigator discovered that the text message was sent four months prior, the Government recanted this explanation.

15.    Second, at a motion in limine hearing before this Court, the Border Patrol summary witness testified that Defendant's phone rang during the post-*Miranda* interview.   (Mot. in Lim. Hr'g Tr. 16:12-15, Doc. 55.)   According to the summary witness, Agent Gutierrez requested and received permission to check the phone to see who was calling—and saw La Chaparra's number calling.  (*Id.* at 16:16-18, 16:24-17:1.)   While the Agent had the phone in his hand, watching La Chaparra's call, he "c[a]me upon a text message."  (*Id.* at 16:19-23.)   However, the Federal Public Defender's investigator also debunked this story because, according to the call log,

3

Defendant's phone did not receive any calls during that time.   (*Id.* at 40:7-9.)   Moreover, Defendant's phone did not have any communications to or from the number associated with La Chaparra.   (*Id.* at 37:16-22.)

16.     Next, in its "Brief Clarifying Certain Facts," the Government explained that the Border Patrol Agent confused his own government-issued phone with Defendant's phone after putting both phones in his pocket.   (Doc. 51 at 4.)   Based on this mistake, Agent Gutierrez "ask[ed] Defendant for permission to see who was calling and look through the phone."   (Doc. 52 ¶ 12.)

17.     Finally, at the motion to suppress hearing, the Government conceded that parts of the third story were inaccurate.   At that time, the Government presented the fourth iteration of facts, as described in this Order.

## CONCLUSIONS OF LAW

1.     Defendant requested a hearing on the motion to suppress, but his request came a month after the Court-approved motions deadline.   Although this motion was untimely, the Court found Defendant showed "good cause" under Rule 12(c)(3) for making this motion.   The Government's factual story changed significantly over the course of the litigation.   Defendant explained that, based on the Government's initial discovery, he had no reason to question the legitimacy of the search.   Once the Government's story evolved, however, defense counsel became concerned about the validity of the search.   The Court, itself, shared the concern and requested briefing on the issue after the motion in limine hearing.   (Doc. 47 at 7-8.)   In sum, the Court found good cause to consider the merits of the motion based on the shifting facts surrounding the search and the substantial concerns about the constitutionality of the search. *Accord United States v. Carson*, 762 F.2d 833, 835 (10th Cir. 1985) (finding that the magistrate

judge erred when he declined to consider defendant's untimely motion to suppress even though recent government reports showed that the investigating officer conducted a search in violation of the Fourth Amendment).   Clarifying the factual underpinnings of this case was a belabored and unsettling process.

2.     Indisputably, Border Patrol Agents searched Defendant's phone when they looked through his text messages.   In *Riley v. California*, the Supreme Court held that officers generally need a warrant to search an arrestee's phone.   134 S. Ct. 2473, 2485 (2014).   "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."   *Id.* at 2488-89.   "Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day." *Id.* at 2490.   Furthermore, as the Supreme Court noted,

> [T]he data on a phone can date back to the purchase of the phone, or even earlier.   A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

*Id.* 2489.   This last concern is as compelling for simple flip phones as it is for smartphones.   In fact, one of the two phones at issue in *Riley*—a phone that the Supreme Court found was illegally searched—was a flip phone like the one at issue here.   *Id.* at 2481.

3.     Here, the Government contends that Border Patrol received consent to conduct a full search of Defendant's phone.   Consent is a well-recognized exception to the warrant requirement.   *See Kentucky v. King*, 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865 (2011) (explaining exceptions to the warrant requirement).   If Border Patrol received consent to search through Defendant's phone and text messages, the search was lawful.

4.     The Government has the burden to show that consent was voluntary and the

5

proffered evidence admissible.  *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995); *see also United States v. Truong Son Do*, No. 14-CR-0139-CVE, 2014 WL 5312023, at *8 (N.D. Okla. Oct. 17, 2014) (applying the *Angulo-Fernandez* consent factors to a cell phone search).  "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'"  *Id.* (quoting *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991)).  Second, "the government must prove that this consent was given without implied or express duress or coercion."  *Id.*

5.      To be considered legal, not only must a consensual search be voluntary, the search must be within the scope of consent.  *See Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) (holding that consensual searches must fall within the scope of consent to be considered reasonable under the Fourth Amendment).  Before a suspect can give informed consent to a search, law enforcement agents must advise the suspect of the scope or the goals of the search. *See id.*  When seeking consent to search a cell phone, law enforcement agents should be clear about whether they are planning to search an entire phone or seeking specific information.  By analogy, simply because a defendant consents to a search of his glove compartment does not mean that he consented to a search of his trunk.  Nowadays, even "the most basic phones" have an "immense storage capacity."  *Riley*, 134 S. Ct. at 2489.  For instance, a cell phone "might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on."  *Id.*  In short, "a cell phone collects in one place many distinct types of information."  *Id.* at 2489.

6.      The Government has the burden to prove that Defendant consented to a full search of his phone, including all text messages, but failed to meet the standard.  Based on the Border Patrol Agents' accounts, Defendant gave the Agent permission to look at the phone and the phone

call log.   However, Defendant's consent was not informed; and, by looking through fourth-month-old text messages, Agent Gutierrez exceeded the scope of Defendant's consent.

7.     When determining the scope of consent, the key question is "whether it would be objectively reasonable for a law enforcement officer to conclude that a suspect's general consent to search extends to" the whole phone or to "a particular" data source in the phone.   *Cf. United States v. Marquez*, 337 F.3d 1203, 1208 (10th Cir. 2003) (discussing whether consent to search a car extends to particular containers within the car (citing *Jimeno*, 500 U.S. at 251)).   "The scope of a search is generally defined by its expressed object, and is limited by the breadth of the consent given."   *Jimeno*, 500 U.S. at 251; *see also United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997) (quoting same).   Courts question whether the investigating officer informed the suspect of the goal of the search.   *See, e.g.*, *Jimeno*, 500 U.S. at 251 (finding search of car compartment reasonable where the officer told the defendant that he would be searching the car for narcotics); *United States v. Avila*, 968 F.2d 1224 (10th Cir. 1992) (affirming lawfulness of search where the defendant "was aware of the object of the search"); *Marquez*, 337 F.3d at 1208 (finding a search of particular containers reasonable "after the officer specifically asked if he could search for guns or drugs").   Courts may also consider whether the investigating officers advised suspects that they are free to refuse consent.   *See United States v. Ramstad*, 219 F.3d 1263, 1268 (10th Cir. 2000) (stating that such advisory warnings go to voluntariness of consent); *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (same).

8.     To measure the scope of a person's consent, courts ask, "What would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251 ; *see also United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004) (quoting same).   Here, the Court finds that Defendant was not fully informed about the nature of

Border Patrol's search before he gave consent to search his phone.   Any consent he gave to the search of his phone was equivocal at best.

9.      The context leading up to Border Patrol Agent Gutierrez's search is telling.   *See United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005) ("The government bears the burden of proving voluntary consent based on the totality of the circumstances." (citing *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990 (10th Cir. 1993))).   While receiving his *Miranda* warnings, Defendant heard a cell phone ringing, with his ring tone, coming from his car. Defendant was not aware that any cell phone, besides his own, was in his car.   When Agent Gutierrez asked if he could check who was calling and look through Defendant's phone, Defendant was likely focused on the recently missed call.   The supervising Border Patrol Agent testified that, given the context, he assumed that Defendant's phone had recently rung and that Agent Gutierrez wanted to see who had called.

10.     Moreover, the question that Border Patrol Agent Gutierrez asked was compound. Agent Gutierrez asked if he could check who was calling and look in Defendant's phone. "Compound questions are inherently confusing."   *See Sumpter v. Ahlbrecht*, No. 10-CV-00580-WYD-MJW, 2012 WL 252980, at *6 n.10 (D. Colo. Jan. 26, 2012).   Drawing clear conclusions about responses to compound questions is difficult.   When confronted with compound questions, people often focus on the first question without fully considering the balance of the question.   *See id.* at *6 ("Opposing counsel asked a compound question, of which [the witness] appears to have answered only the first part, and I cannot conclude to a significant level of certainty that she thereby intended to answer the second part in the negative.").   Here, the first question was focused on the recently heard phone call, while the second question focused on a general search of the phone.   Whether the Defendant wanted to assent to both questions is

ambiguous—not "unequivocal and specific."   *See Angulo-Fernandez*, 53 F.3d at 1180.

11.    Based on the context and the confusingly-worded questions, the Court finds that the consent given was not general in scope, but specific to the recently missed call.   Here, not only was the Defendant not sufficiently informed about the nature of the search, he was in fact *mis*informed about which phone was ringing.   Through its own actions, Border Patrol Agents created the misimpression that Defendant's phone rang after his arrest.   Under these circumstances, Defendant's consent to search his phone was limited to a review of his recent call log.   When Agent Gutierrez searched through four-month-old text messages on Defendant's phone, he exceeded the scope of consent.   For that reason, the text message must be suppressed.

12.    The Government argued that even if the consent was limited in scope, Defendant acquiesced to the general search because he did not object when the Agent starting looking at his text messages.   A defendant's objections, or lack thereof, can be helpful in defining the scope of a search.   *Marquez*, 337 F.3d at 1208 ("[A]t no time did Mr. Marquez limit the scope of his consent to search the vehicle or otherwise indicate that he did not wish the officers to search the compartment, a fact this court has often found significant in determining whether a law enforcement officer has exceeded the scope of a suspect's consent.").   "That rule, however, applies only when the defendant initially gave a general authorization to search."   *United States v. Wald*, 216 F.3d 1222, 1228-29 (10th Cir. 2000) (citation omitted).   When the consent is limited in nature as opposed to general, an officer cannot extend the scope of the search simply by overstepping his bounds.   *See id.*

13.    The Court also excluded the subsequent confession as the fruit of the poisonous tree.   According to the Government, "the text message . . . prompted Defendant to change his story" and confess.   (Doc. 52 at 2.)   The Supreme Court reasoned that "[w]e need not hold that all

evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"   *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)).   Throughout the litigation, the Government has taken the position that the confession was directly tied to the moment when Border Patrol found the text message and showed it to Defendant.   (Doc. 52 at 2.)   No one argued that any intervening circumstances attenuated the taint.   For that reason, the Court suppresses the confession based on the illegality of the preceding search.

THEREFORE,

IT IS ORDERED that Defendant's Motion to Suppress (Doc. 31) is **GRANTED**.   The Government may not use the text message or the subsequent confession as evidence in trial.

ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE